UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA


| ROSELLE JONES | CIVIL ACTION |
|---|---|
| VERSUS | NO: 09-7516 |
| CHUBB & SON, INC. AND FEDERAL INSURANCE COMPANY | SECTION: "J"(2) |


## ORDER AND REASONS

Before the Court is Plaintiff's Motion to Lift Stay **(Rec. Doc. 16)**, Defendant, Federal Insurance Company's Opposition (Rec. Doc. 21), and Plaintiff's Reply (Rec. Doc. 24). The motion came on for hearing, on the briefs, on May 8, 2013. Having considered the motion, the memoranda, the record, and the applicable law, the Court finds that Plaintiff's Motion to Lift Stay **(Rec. Doc. 16)** should be **GRANTED**.

### PROCEDURAL HISTORY AND BACKGROUND FACTS

On November 17, 2009, Plaintiff, Roselle Jones, filed suit in the Civil District Court for the Parish of Orleans against, *inter alia*, Federal Insurance Company ("Federal"), her homeowners'

insurer. (Rec. Doc. 1-1) Plaintiff sought damages for Federal's alleged failure promptly investigate and settle her homeowners' claim arising out a fire that occurred on October 24, 2008 and allegedly destroyed Plaintiff's home on Napoleon Avenue in New Orleans.[1] (Rec. Doc. 1-1) On December 3, 2009, the Defendants removed the case to this Court on the basis of diversity of citizenship. (Rec. Doc. 1)

Prior to filing the fire claim under her homeowners' policy, Plaintiff had filed a Hurricane Katrina claim with Federal in August of 2005, and Federal made final payments on that claim, in the amount of approximately 1.4 million dollars, in January of 2008. The parties dispute how much Katrina-related repair work Plaintiff had done on the property at the time of the fire. Federal asserts that it believed that Plaintiff had done little, if any, work to repair the Katrina damage prior to the fire that occurred on October 24, 2008. Plaintiff asserts that at the time the fire occurred, she had gutted much of her three-story home's plaster due to rain intrusion caused by Hurricane Katrina, had framed an addition to the home, had installed a swimming pool, and had replaced many of the interior studs, the wood floors and stairs,

---

[1] Plaintiff later admitted in a filing that the parties had been attempting to resolve the claim informally and that she filed the lawsuit as a protective measure to toll the running of applicable prescriptive periods. (Rec. Doc. 11, ¶ 4)

and the roof, all of which was destroyed in the fire. The parties agree that the fire was the subject of an ongoing arson investigation. However, Plaintiff asserts that a male suspect was quickly identified after he was witnessed leaving a door to the premises with a container in his hand before the fire ignited and that she was never established as a suspect in the arson investigation. It is undisputed that Federal tendered a $662,777 payment to Plaintiff on her fire claim in early 2009. However, Plaintiff contends that this payment was both late and insufficient.

Federal asserts that after Plaintiff filed suit on November 17, 2009, it agreed in early 2010, at Plaintiff's request, to resolve the parties' dispute extra-judicially in a cost appraisal proceeding, pursuant to the following provision in Plaintiff's homeowners' policy:

> If you and we fail to agree on the amount of loss, you and we may select an independent appraiser in order to reach a mutual agreement. You and we will share the expenses incurred equally and every effort will be made to reach an agreement within a reasonable time.

(Rec. Doc. 21-1)

Plaintiff asserts that the parties agreed to *attempt* the appraisal process. (Rec. Doc. 24, p. 2) The parties filed a Joint Motion to Stay Proceedings Pending Appraisal (Rec. Doc. 11), which the Court granted in April 2010. (Rec. Doc. 12) The parties

disagree about what ensued after the case was administratively closed pending appraisal. Federal asserts that it diligently pursued the appraisal. Federal claims that based on Plaintiff's request, it hired an independent contractor to estimate the repair costs and to communicate with Plaintiff's public adjuster. Federal asserts that early in the process, the parties communicated, reached certain agreements, and postured the case for the final appraisal hearing before an agreed- upon umpire. According to Federal, at this stage of the process, Plaintiff became unresponsive. For example, Federal asserts that during 2012 alone, it's adjuster contacted Plaintiff's public adjuster at least nine times seeking property damage information in connection with appraisal and/or settlement. Federal contends that most times, Plaintiff's pubic adjuster did not respond, but that on at least three occasions, it responded that it awaited receipt of the same information from Plaintiff. Federal contends that no one ever advised Federal that cost was a consideration, much less an obstacle, and that all that remains in the appraisal process is to submit each side's claim to the appraisal umpire.

Plaintiff asserts that the status of the appraisal process is that the parties' appraisers selected an umpire and may have had one or two discussions. Plaintiff asserts that no other steps in the appraisal process occurred thereafter, with several years of

inaction. On March 19, 2013, nearly three years after the parties initiated the appraisal process, Plaintiff filed the instant Motion to Reopen seeking to lift the stay in this matter in order to proceed with discovery and trial on her claims. Plaintiff asserts that she now wishes to proceed to trial, because her financial condition has ultimately impeded the parties' efforts to jointly resolve their dispute through the appraisal process.

## PARTIES' ARGUMENTS

Plaintiff asserts that the appraisal process has become too costly given her current financial position. Plaintiff claims that she already owes her expert appraiser several thousands of dollars in consulting fees and would have to pay an expert appraiser several thousands more to participate in a full-blown appraisal process, as well as bear her half of the costs associated with the appraisal process itself, including the umpire's fees. Plaintiff also claims that she recently learned that her expert appraiser's Louisiana license is not being renewed, necessitating that she initiate a search for a new expert appraiser who will need to be brought up to speed in the case and likely cost thousands more. Plaintiff asserts that since October 24, 2008, the date of the fire, she has gone through a divorce and lost her job as a commercial airline pilot. According to Plaintiff, the facts show that she did not simply "change her mind" about the appraisal

process that the parties agreed to in March of 2010 but instead participated in the appraisal process in good faith until the financial burden became impossible for her to continue. Plaintiff asserts that in the three years that have gone by since the parties initiated the appraisal process, she continues to face financial hardship and that the costs associated with the appraisal process have not diminished. Plaintiff argues that the Court should lift the stay, because her claims should not languish under the stay, with no movement in this case toward any resolution, until she has enough money to continue.

In its opposition, Federal asserts that the Court should deny Plaintiff's Motion to Lift Stay, require Plaintiff to honor her promise to resolve the dispute extra-judicially, and require Plaintiff to resolve the dispute through an appraisal proceeding. Federal asserts that Plaintiff's claim that her financial situation has impeded the appraisal process is insufficient to reopen the case and abandon the more cost-effective process that Plaintiff requested. Federal asserts that reopening the case would prejudice Federal, because it spent substantial time and money in the process and all that remains is to submit each side's claim to the appraisal umpire. Federal asserts that provisions in insurance policies providing for appraisal in the event that parties disagree as to the amount of loss are valid in Louisiana. Federal further

argues that the purpose of cost appraisal proceedings is to escape the delay, cost, and technicality of judicial proceedings.

Federal makes two principal legal arguments. The first argument is based on estoppel and the second is based on Plaintiff's alleged breach of a policy condition, which allegedly precludes Plaintiff from suing Federal. With regard to estoppel, Federal argues, relying on <u>Mitchell v. Aetna Casualty & Surety Co.</u>, 579 F.2d 342, 348 n. 4 (5th Cir. 1978), that the Fifth Circuit has observed that once an insured has agreed to and taken steps to participate in appraisal proceedings, she should be estopped from then repudiating the appraisal proceedings.

With regard to Plaintiff's alleged breach of the policy condition, Federal argues, relying on <u>Woodward v. Liberty Mutual Insurance Co.</u>, No. 09-0228, 2010 WL 1186323, at *3 (N.D. Tex. Mar. 26, 2010) and <u>Boler-Phillips Body Shop, Inc. v. Employer's Mutual Casualty Co.</u>, 251 F. App'x 912, 914-15 (5th Cir. 2007), that the appraisal provision is a condition that, once triggered, must be fulfilled. Federal argues that by triggering the policy condition, allowing the process to advance toward the hearing stage and then delaying an ultimate hearing for more than a year and refusing to cooperate despite Federal's active participation, Plaintiff failed to make efforts to reach an agreement within a reasonable time, thereby breaching the part of the appraisal provision stating that

"every effort will be made to reach agreement within a reasonable time." Federal argues that the policy provides that the insured agrees not to bring legal action against Federal unless she first complies with all conditions of this policy. Federal contends that Plaintiff's asserted breach of the appraisal "condition" precluded Plaintiff from bringing suit under the terms of the policy.

Finally, Federal contends that Plaintiff's asserted reason for changing her mind — her financial difficulties — is not credible considering that (a) Plaintiff never indicated that she lacked the financial wherewithal to complete the appraisal proceeding, and (b) Federal paid Plaintiff more than $2 million dollars to repair her home and believes that she only expended a minimal amount of the proceeds to repair the damage to her home as a result of Hurricane Katrina and the fire.

In her reply, Plaintiff concedes that appraisal provisions in insurance policies are generally enforceable, but contends that the appraisal provision in the policy at issue is much less specific than the ones in the cases that Federal relies on. Moreover, Plaintiff asserts that she made "every effort" within her means to participate in the appraisal process since the case was stayed in April 2010, that a reasonable time has now passed, that her financial condition could forever forestall the appraisal process,

and that allowing her claims to languish would severely prejudice her, which is not the purpose of the appraisal process, even when invoked. Plaintiff asserts that Federal's estoppel argument fails, because <u>Mitchell</u> is distinguishable. Plaintiff asserts that Federal's argument that Plaintiff "breached" the insurance policy by filing suit before complying with all policy conditions fails for two reasons. First, Plaintiff asserts that the appraisal provision is permissive, not mandatory, and that no part of Federal's policy dictates a mandatory appraisal process prior to the filing of a lawsuit. Second, Plaintiff argues, relying on <u>Woodfield v. Bowman</u>, 193 F.3d 354 (5th Cir. 1999), that if any provision in Plaintiff's policy actually stood for the proposition that Plaintiff had no right to bring this lawsuit, Federal should have specifically pleaded it as an affirmative defense, and waived that defense by failing to do so. Finally, Plaintiff argues that Federal's assertions that it paid Plaintiff more than $ 2 million dollars to repair her home are of no import for purposes of the instant motion.

## DISCUSSION

### A. Estoppel

Federal argues that Plaintiff should be estopped from reopening the instant action, relying on <u>Mitchell</u> for the proposition that once an insured has agreed to and taken steps to

participate in appraisal proceedings, she should be estopped from then repudiating the appraisal process. Plaintiff argues that <u>Mitchell</u> is factually distinguishable, because the plaintiff in <u>Mitchell</u> sought to repudiate the umpire's appraisal value reached after a full-blown appraisal process, whereas in this case, the appraisal process is not as advanced. In contrast with <u>Mitchell</u>, Plaintiff asserts that since this case was stayed in April 2010, both sides had their appraisers select an independent appraiser and had one or two discussions. Plaintiff asserts that the independent appraisal process simply ceased after the naming of the umpire, because Plaintiff could not afford to pay her appraisal expert's hourly fees or half of the appraisal process. The Court is not persuaded by Federal's estoppel argument and finds that <u>Mitchell</u> is inapposite.

Federal cites <u>Mitchell</u> as indirect support for the proposition that once an insured has agreed to and taken steps to participate in appraisal proceedings, she should be estopped from repudiating the appraisal proceedings. However, <u>Mitchell</u> is silent on the question of whether an insured who agreed to stay her lawsuit to participate in an appraisal process should later be estopped from reopening her case on the grounds that her financial circumstances purportedly prevent her from continuing with the appraisal process. In <u>Mitchell</u>, the Fifth Circuit found that a

district court should have directed a verdict for several insurance companies on the issue of whether an insured could rely upon an agreement that he allegedly reached with an insurance appraiser as to the amount of his loss. 579 F.2d at 344. In <u>Mitchell</u>, after an insured's properties were damaged during Hurricane Camille, he reached an agreement with an insurance adjuster who acted on behalf of the insurance companies that the amount of his loss totaled $42,312.18. <u>Id.</u> at 345. The insured understood that this agreement with the insurance adjuster was the final agreement with the insurance companies as to the amount his would receive for the damage to his properties. <u>Id.</u> Thereafter, the insurance companies sent out a second adjuster who found that the amount of the insured's loss was only $20,900; the insurance companies recalled the checks they had previously issued to the insured; and the insurance companies informed the insured that they would not approve the loss amount that the first adjuster recommended. <u>Id.</u> In response, the insured sent the insurance companies a letter complaining about the second adjuster and demanding "arbitration," which the insurance companies interpreted as a request to invoke the appraisal clause in the insured's policies. <u>Id.</u> Although the insured insisted that he was attempting to enforce the agreement with the first adjuster, not requesting appraisal, he hired a lawyer who helped him locate an appraiser, communicated with the

insurance companies, and never indicated that the insured objected to the appraisal. Id. at 345-46. During the appraisal process, the insured never renewed his request for "arbitration," or asked to stop the appraisal proceeding as a "mistake," and two years after the appraisal proceedings began, the appraiser set the insured's final loss amount at $20,957.41. Id. at 346.

After the appraisal proceedings were complete, the insured filed suit, alleged that the properties had been a total loss, and asked for the full $55,000 value of his policies. Id. He also alleged that he had formed a valid agreement with the first adjuster as to the amount of his loss and asked that the Court enforce that agreement. Id. The case was tried before a jury, and the jury returned a verdict of $42,312.18, based on the insured's theory that he had entered into a binding agreement with the insurance companies as to the amount of his hurricane losses, through the first insurance adjuster, in the amount of $42,312.18. Id.

After trial, the insurance companies appealed and argued that even if, at one time, the insured had a valid agreement with the insurance companies as to the amount of his losses through the first insurance adjuster, he waived and abandoned that agreement when he requested "arbitration," and participated in the appraisal proceedings. Id. at 347. The Fifth Circuit explained that estoppel

was one of two legal theories that could deprive the insured of the benefit of the agreement that he formed with the first adjuster. Id. Estoppel is a doctrine which allows a court to prevent a party from raising a valid legal argument if "(1) his actions or words are inconsistent with the legal right he later asserts; (2) he intends or could expect that the party asserting estoppel would act upon his words or conduct; (3) he knows the real facts; (4) the party asserting estoppel does not know the true facts; (5) the party asserting estoppel relies upon the conduct or statements of the party to be estopped; and (6) the party asserting estoppel is harmed or prejudiced by his reliance." Id. at 347-48. The insurance companies in Mitchell primarily argued waiver and rescission, not estoppel, and the Fifth Circuit accordingly found that the record established rescission of any agreement between the insured and the first adjuster. Id. Nevertheless, the Fifth Circuit also noted, in a footnote that Federal relies on:

> Although we rely primarily on our determination that the record unquestionably shows a waiver or offer of rescission through conduct, our conclusion is bolstered because the facts also show elements of estoppel. [The insured's] letter, his subsequent failure to object to the Insurance Companies' interpretation of his letter as a request for appraisal, and *his full participation in the appraisal proceedings predictably led the Insurance Companies to participate in the appraisal*. If Dr. Mitchell were now allowed to repudiate the appraisal and to insist on [the agreement with the first adjuster] *the Insurance Companies would lose their part of the costs of*

*the appraisal in which [the insured's] conduct induced*
*them to participate*.

Id. at 348 n. 4 (emphasis added).

Thus, the issue in Mitchell and the issue in this case are different. In Mitchell, the question was whether the insured should be estopped from arguing in his subsequent lawsuit that he had an enforceable agreement with the first insurance adjuster as to the amount of his loss when he subsequently requested "arbitration," hired a lawyer who located an appraiser, never indicated that he objected to the appraisal, never asked to stop the appraisal proceeding, and participated in the appraisal proceedings through completion. Here, the issue is whether the insured should be estopped from arguing that her case should be *reopened* because her financial difficulties have impeded her completion of the appraisal process. There is a significant difference between finding that an insured who has acquiesced in and completed the appraisal process is estopped from raising an earlier agreement as to the amount of the loss and finding that an insured who requested appraisal and participated in appraisal to a limited extent, should be estopped from seeking to reopen her case on the grounds that her finances inhibit her from completing the appraisal process. Moreover, given that in Mitchell the estoppel issue arose in a lawsuit that the insured filed after completing the appraisal process, the Court

14

does not read the case to prevent a plaintiff who has not completed the arbitration process from reopening a lawsuit.

Moreover, even if <u>Mitchell</u> stood for the proposition that an insurance company could estop a Plaintiff from reopening a lawsuit, the Court finds that the elements of estoppel outlined by the Fifth Circuit are not satisfied in this case. First, Plaintiff's actions are not inconsistent with the legal right she now asserts to reopen her lawsuit due to her financial constraints. Although Federal contends that Plaintiff promised to resolve the instant dispute through the appraisal process, the Court agrees with Plaintiff that the parties merely agreed to *attempt* to resolve the instant dispute through the appraisal process. Although the parties did request, in their Joint Motion to Stay the Proceedings in March of 2010, that the Court stay Plaintiff's lawsuit "pending the *outcome* of a cost appraisal proceeding," which implies that the case would be stayed until the appraisal proceeding was complete, the parties also stated that they were, "*hopeful* that their dispute can be fully and finally resolved through the appraisal process." (Rec. Doc. 11, pp. 1-2, ¶ 7) This language indicates to the Court that when the case was stayed, the parties acknowledged a possibility that they would be unable to fully and finally resolve their dispute through the appraisal process, in which case the lawsuit would need to be reopened. Thus, Plaintiff's attempt to reopen her case now on the

grounds that her financial condition prevents her from completing the appraisal process is not necessarily inconsistent with Plaintiff's prior request and agreement to attempt to resolve her dispute with Federal through the appraisal process.

Second, the Court is skeptical that Federal will suffer the kind of prejudice required for estoppel if Plaintiff's case is reopened at this juncture. Although Federal incurred the cost of an independent contractor to estimate Plaintiff's repair costs, this is a cost Federal likely would have incurred regardless of whether Plaintiff proceeded with litigation or with the appraisal process. Unlike in <u>Mitchell</u>, Plaintiff's actions have not caused Federal to incur the cost of two proceedings to determine the amount of Plaintiff's loss. The parties have merely selected an appraisal umpire and have not yet incurred the costs associated with submitting the appraisal issue to the umpire. The Court reads the language in the <u>Mitchell</u> footnote that Federal relies on as indicative of the Fifth Circuit's concern with insurers' reliance on insureds' *full* participation in the appraisal process and prejudice in the form of the actual costs of the final appraisal hearing before the umpire. <u>Id.</u> at 248 n. 4. In addition, if, as Federal contends, Plaintiff stopped responding early on in the process to Federal's appraiser's requests for information, the Court suspects that at that point, Federal would have been both

16

hesitant to invest further time and resources in the process, and, as a practical matter, unable to take significant further action without cooperation from the other side. The Court also notes that the case was stayed in April 2010 and that Federal's specific complaints regarding Plaintiff's lack of cooperation are aimed nearly exclusively at Plaintiff's unresponsiveness during 2012, leaving nearly two years of delay unaccounted for, during which time the Court suspects that neither party invested significant resources on the appraisal process. Similarly, although Federal complains about the time that it has invested in the appraisal process, it has not offered any explanation for the delay between April 2010, the time when the case was stayed, and 2012, the first year that Federal recounts making several attempts to obtain information from Plaintiff, suggesting to the Court that, at least with respect to that period, Federal, if not playing a role in the delay, at least acquiesced in it. In any event, allowing Plaintiff to reopen her case will most likely accelerate the resolution of the parties' disputes and further both parties' interests in avoiding wasted time, given the parties' history of delay in the appraisal process, the Plaintiff's current financial condition, and the inevitable imposition of a scheduling order once the case is reopened.

Although Plaintiff may have been aware of her job loss and divorce when she began the appraisal process, it is likely that she

did not feel the full financial effect of these events until she was much further into the appraisal process. Indeed, Plaintiff contends that she made every effort within her means to participate in the appraisal process since her case was stayed. Federal concedes that Plaintiff was actively involved in the process initially, through its assertion that early in the process, the parties communicated, reached certain agreements, and postured the case for the final appraisal hearing before an agreed- upon umpire. Federal's own acknowledgment of Plaintiff's early participation is consistent with Plaintiff's contentions that she intended to participate in the appraisal proceedings in good faith and only sought to reopen this case when her financial difficulties became too great. Plaintiff has specifically identified several expenses associated with the appraisal process that she now cannot afford, namely (a) several thousand dollars she owes her appraiser in consulting fees, (b) several thousand dollars in consulting fees that she would need to incur if the dispute were submitted to the umpire, and (c) her half of the umpire's fees. Although litigation also involves expenses, the availability of contingency fee arrangements may explain why litigation is financially feasible for Plaintiff while the appraisal proceeding is not. Thus, the Court declines to find that Plaintiff is estopped from seeking to reopen her case based on her financial circumstances.

**B. Breach of Policy Condition**

The Court is not persuaded by Federal's argument, based on Woodward v. Liberty Mutual Insurance Co., No. 09-0228, 2010 WL 1186323 (N.D. Tex. Mar. 26, 2010) and Boler-Phillips Body Shop, Inc. v. Employers Mutual Casualty Co., 251 F. App'x 912 (5th Cir. 2007), that the appraisal provision in Plaintiff's policy is a condition that, once triggered, must be fulfilled. Although appraisal provisions, as a general rule, are valid under Louisiana law, Triple K, Inc. v. Century Surety Co., No. 10-1236, 2010 WL 3418237, at *2 (E.D. La. Aug. 23, 2010), the two cases that Federal relies, Woodward and Boler-Phillips, apply state insurance law that is inapplicable in this case. In Woodward, the United States District Court for the Northern District of Texas applied Texas insurance law, and relied on recent Texas Supreme Court cases that "'enunciated a strong policy in favor of enforcing appraisal clauses in insurance contracts," and held that "[a] completed appraisal that complies with the terms of an appraisal clause in an insurance contract is a condition precedent to bringing a suit on the contract." 2010 WL 1186323, at *3. In Boler-Phillips Body Shop, Inc., the Fifth Circuit applied Mississippi law. 251 F. App'x at 914-15. Neither party has briefed the threshold question of which state's law applies to the determination of whether a completed appraisal is a condition precedent to suit by an insured. Nevertheless, there is no indication that either party to this

diversity case had any contacts with Texas or Mississippi.
Plaintiff is a resident of Louisiana, (Rec. Doc. 1, p. 2, ¶ 7) and
the property at issue is located in Louisiana. (Rec. Doc. 1, p. 2,
¶ 2) Federal is a foreign insurer incorporated under the laws of
the State of Indiana with its principal place of business in New
Jersey. (Rec. Doc. 1, p. 2, ¶ 8) In the absence of any contacts
with Texas or Mississippi, the Court declines to rely on <u>Woodward</u>
and <u>Boler-Phillips Body Shop, Inc.</u>, both of which rely on insurance
law that is clearly not applicable in this case.     As none of
the authorities either party relies on are dispositive, the Court
must exercise its discretion. With a few exceptions that are not
applicable in this case, "[t]he decision whether to grant or deny
a stay is completely within the discretion of the Court." <u>McCrary
v. Bayer Corp.</u>, No. 02-642, 2002 WL 1467691, at *1 (E.D. La. July
3, 2002) (citing <u>Landis v. North American Co.</u>, 299 U.S. 248, 254-55
(1936)). The decision whether to grant or deny a motion to re-open
a case stayed pursuant to the district court's inherent power to
control its docket is similarly within the Court's discretion. <u>See
id.</u> at *1 (denying a plaintiff's motion to reopen a case based on
the court's opinion that the interests of judicial economy and
avoidance of inconsistent rulings resulting from the extension of
the stay outweighed any prejudice resulting from the short delay).
After considering the contentions of both parties and the record,
the Court finds that allowing Plaintiff to reopen her case is more

likely to further both parties' interests in avoiding further delay and that the prejudice Plaintiff will likely endure if denied the opportunity to reopen her case most likely outweighs any prejudice Federal will endure if the case is reopened. Accordingly,

**IT IS HEREBY ORDERED** that Plaintiff's Motion to Lift Stay **(Rec. Doc. 16)** is **GRANTED**.

New Orleans, Louisiana, this 25th day of June, 2013.

CARL J. BARBIER
UNITED STATES DISTRICT JUDGE